IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TODD DOUGLAS UDALL,**<br><br>                                   Petitioner,<br><br>        **v.**<br><br>**KAMALA HARRIS,**<br><br>                                   Respondent. | **Case No. 1:14-cv-00474 MJS (HC)**<br><br>**ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent, California Attorney General Kamala Harris, is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.[1] Respondent is represented by John A. Bachman

---

[1] The rules governing relief under 28 U.S.C. § 2254 require a person in custody pursuant to the judgment of a state court to name the "state officer having custody" of him as the respondent. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 894 (9th Cir. 1996) (quoting Rule 2(a) of the Rules Governing Habeas Corpus Cases Under Section § 2254). This person typically is the warden of the facility in which the petitioner is incarcerated. Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994). Here, Petitioner is no longer incarcerated. That he is not incarcerated does not moot the petition, see Spencer v. Kemna, 523 U.S. 1, 8-12, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998) (courts may presume that a criminal conviction has continuing collateral consequences sufficient to avoid mootness), but it does mean that there is no warden, jailer, or probation officer who would be a proper respondent. Kamala Harris, the

(continued…)

of the office of the Attorney General. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 8-9.)

## I.  Procedural Background

Petitioner was placed in custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on May 19, 2011, of two counts of contacting or attempting to contact a minor with intent to commit a lewd act, one count of providing harmful matter to a minor for sexual purposes, and two counts of attempting to provide harmful matter to a minor for sexual purposes. (Clerk's Tr. at 666-67.)  On July 26, 2011, Petitioner was sentenced to a determinate term of three years and eight months in state prison.  (Id.) While not reflected in the record, it appears that Petitioner has since been released from confinement.

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District. The Court ordered the abstract of judgment to be modified to accurately reflect the proper crimes for which Petitioner was convicted, but otherwise affirmed the judgment on October 11, 2013. (Lodged Docs. 1-4.) Petitioner sought review from the California Supreme Court. (Lodged Docs. 5-6.) The California Supreme Court denied review on January 15, 2014. (Id.)

Petitioner did not attempt to file collateral challenges to his conviction in state court in the form of petitions for writ of habeas corpus.

On April 3, 2014 Petitioner filed the instant federal habeas petition. (Pet., ECF No. 1.) Petitioner presented three claims for relief in the petition: (1) that the trial court violated his due process rights by not providing instructions on lesser included offenses; (2) that Petitioner's equal protection rights were violated by denying him half-time custody credits in prison; and (3) that the crimes of conviction violated his First

---

(…continued)

Attorney General of California, is hereby substituted as the properly named respondent. See Rule 2(b), Rules Governing Habeas Corpus Cases Under Section § 2254, 1975 advisory committee's note (when petitioner is not incarcerated or on probation or parole, proper respondent is the Attorney General).

1    Amendment rights to free speech. (Id.)

2           Respondent filed an answer to the petition on August 21, 2014. (ECF No. 17.)

3    Petitioner filed a reply on September 8, 2014. (ECF No. 18.) The matter stands ready for

4    adjudication.

5    **II.    Statement of the Facts**[2]

6           FACTUAL AND PROCEDURAL HISTORIES

7           During the relevant time period in 2009, Julia W. was 13 years old
     and living in Fresno County with her grandfather. She met the Udall
8    family—defendant, his wife (Wife), and their 11-year-old daughter
     (Daughter)—through church. Daughter and Julia were friends, and Julia
9    was "friends" on Facebook with Daughter, Wife, and Udall.

10          In September 2009, Julia's grandfather reported to the police that
     Julia had received inappropriate messages from Udall. Julia told a police
11   officer that she had conversations with Udall through Facebook that made
     her extremely uncomfortable. The police later logged into Julia's Facebook
12   account and engaged in Internet communications with Udall while
     pretending to be Julia.
13
            As a result of the police investigation, Udall was charged with six
14   counts: (1) contacting or attempting to contact a minor with intent to
     commit a lewd act upon the child in violation of section 288.3, subdivision
15   (a), on September 18, 2009; (2) violation of section 288.3, subdivision (a),
     on September 19, 2009; (3) arranging a meeting with a minor for the
16   purpose of engaging in lewd or lascivious behavior in violation of section
     288.4, subdivision (a)(1), on September 18, 2009; (4) providing harmful
17   matter to a minor for sexual purposes in violation of section 288.2,
     subdivision (a), on September 17, 2009; (5) attempting a violation of
18   section 288.2 on September 18, 2009; and (6) attempting a violation of
     section 288.2 on September 19, 2009.[fn2]
19
            **FN2**: The first amended complaint incorrectly describes
20          counts 1 and 2 as "arranging meeting with minor for lewd or
            lascivious behavior." These factual allegations describe a
21          violation of section 288.4, not section 288.3. The prosecutor,
            however, clarified that counts 1 and 2 allege violations of
22          section 288.3—contacting or attempting to contact a minor
            with intent to commit a lewd act—and the jury was correctly
23          instructed on the elements of section 288.3 for those counts.

24          A jury trial began on May 10, 2011. Julia testified that Daughter was
     her good friend and she had spent a lot of time with both Daughter and
25   Wife, visiting their house twice and spending the night on one occasion.
     Julia also joined Daughter's family, including Udall, on a trip to Shaver
26   Lake on September 7, 2009.

27   ───────────────
     [2] The Fifth District Court of Appeal's summary of the facts in its October 11, 2013 opinion is presumed
28   correct.  28 U.S.C. § 2254(e)(1).

Julia first communicated with Udall by instant chat to ask about the Shaver Lake trip. Julia explained that instant chat on Facebook is a private communication that is not posted on one's Facebook page. She began having instant chats with Udall almost every night. At first there was nothing unusual about her Internet conversations with Udall, but at some point, they became inappropriate and sexual. Julia recalled telling Udall that she was going to a school dance and he said he used to get kicked out of dances for touching girls and he would like to dance with her. Udall told her if she had a boyfriend, he would make her break up with him. Julia reminded Udall that he was married, and he responded that it did not matter and he had cheated before. Udall told Julia she looked like she was 16 years old in her pictures. He talked about them going on a date when Wife would be at a women's retreat organized by their church. He said they could have sex at his house and he would lick her wherever she wanted. He asked if Julia had had sex before. She said no, and Udall responded, "Good. That is the way I like them." He told her he could make it not hurt. Udall also said that he could meet Julia before he picked up his kids. He said they could meet "in a few days." He talked about meeting Julia after his son's soccer games and discussed having sex in his house. Julia deleted her instant chats with Udall because he told her it would be better as "neither of us would get in trouble."

Julia told her grandfather about her Facebook conversations with Udall, and he contacted the police. Udall also asked Julia for her cell phone number and began sending her text messages; on September 18, 2009, he sent her more than 50 messages. Julia told her grandfather about the text messages, and he again notified the police.

Police Officer Abby Padgett testified that she was dispatched to Julia's grandfather's house on Thursday, September 17, 2009, to investigate the grandfather's initial report. Padgett spoke with both Julia and her grandfather. Julia told Padgett that she had been having instant chat conversations with Udall for the previous couple months; initially, they talked about school and normal activities. Then, about two weeks earlier, Udall told Julia he loved her. The day before Padgett interviewed her, Julia had an Internet conversation with Udall that lasted two to three hours and they had another long conversation on September 17 as well. Julia told Padgett that Udall said he wished he was 14 again so he could dance with her. At some point in the conversation, Julia became extremely uncomfortable and started responding with "oh" and "okay." Udall told her he wanted her really bad and they should see each other alone. He mentioned the possibility that they could go to the movies on Saturday. He said he could probably get his kids out of the house and they would be able to meet. Udall asked Julia if she was alone in her room while they were chatting; he said they could get in trouble if anyone found out about their conversations and he could lose her.

Padgett also described many of Udall's statements that Julia testified about. For example, Padgett testified that Julia told her Udall said he had been kicked out of a school dance for touching girls and he would make her break up with her boyfriend. He said he had cheated before. He told Julia they could have sex at his house and he would lick her wherever she wanted and do whatever she wanted. Udall asked her if she had had sex before, and when she said no, he said, "Good. That's the way I like them." Padgett did not see any of the Facebook conversations that Julia

described as Julia told her she had deleted them.

Police Officer Kory Westbury testified that he continued the investigation, visiting Julia's grandfather's house the next day. Julia told Westbury that Udall had sent her text messages on her cell phone while she was at school that day. There had been so many messages that she had been sent to speak with a counselor about using her cell phone in school. In these text messages, Udall discussed being alone with Julia and doing whatever she wanted.

Photographs of Julia's cell phone text messages were admitted into evidence. Julia's text messages to Udall were not available, however, because she deleted her own outgoing text messages. Udall texted, "I do not know yet, but I hope soon," "[f]igure a time and place to be together," "find a time and place to be alone," "[j]ust be with you and make you happy," and "a full day or more together." Julia sent a text asking Udall what they would do, and he texted back, "Anything you ask." He wrote, "I love your smile. I could look at it all day long. You make me laugh and that makes me happy." He wrote, "This is my first time to want to do this," "want to be with you," and "[b]ut I want to so badly." Udall texted that he wanted to do whatever Julia wanted, he wanted to know what would make her happy, and he wanted "to be with [her] a lot." He texted, "I love talking with you. I also want to do the stuff we talked about last night." Julia and Udall exchanged texts discussing what they would do together. Julia asked what Udall liked, and he responded, "Wow. I love it all so much oral and everything."

The police decided to log into Julia's Facebook account and conduct an instant chat with Udall using her grandfather's computer. At 9:15 p.m. on September 18, 2009, Udall attempted to instant chat with Julia, and Westbury responded, pretending to be Julia. Westbury saved a copy of the chat session, and a transcript of the conversation was admitted into evidence.

During the Internet conversation, Udall wrote, "I was just thinking I wish my family would go out of town for a weekend." Westbury (as Julia) asked why, and Udall responded, "so it would be easier for us to hook up." Udall said that Julia could come over and "we could have fun," "maybe swim at night." Westbury wrote it would be cold, and Udall responded, "there are ways to stay warm" and "share body heat." Westbury suggested they could watch movies. Udall said, "we can get anything you want from on line." Westbury asked what Udall thought, and he responded, "something with sex in it."

Later in the conversation, Westbury asked, "What would you do if you saw me right now?"[fn3] Udall responded, "Kiss you and hug you." Westbury asked Udall what he would want to do. Udall wrote that he wanted to get in bed with Julia, remove her clothes, and "rub my hand all over your body kiss you everywhere." He said he would kiss "breast tummy a little lower," "between your legs," and "your pussy." Westbury asked, "And then do what?" Udall wrote, "If you want, climb on top of you," and "maybe put it inside you." Udall continued, "I want to so badly" and "I am so crazy for you." He wrote, "I will go very slow[.] I don't want to hurt you at all." He also asked, "where do you want me to cum" and said, "if you want to take chances in you [otherwise] pull out." Udall said he was "a little worked up" and his "you know is hard."

**FN3**: The transcript of the chat session shows Westbury typed, "wht wld u do if u saw me rt now." Westbury explained that he wanted to make sure he responded the same way Julia communicated online. Julia testified that she told the police how she typed in a shorthand manner, shortening some words and, for example, typing "OIC" for the phrase, "oh, I see."

Westbury told Udall, "My grandpa is leaving tomorrow. We can meet at the park, if you want to." Udall responded, "that would be kool I will text you when I can get away," "maybe around 4ish." Westbury asked what Udall wanted to do. He responded, "kiss you if we are alone." Westbury asked where they could go, and Udall wrote, "hmmm we will see maybe for a ride." Westbury asked what Udall wanted to do, and Udall responded, "everything." Udall continued, "I like you so much I do not want this to be just about sex and I am new to doing this," "I looked at your pics 100 times today," and "I think I love you." He wrote that he had a great feeling in him and felt "warm not hot I feel great almost like I am floating." Westbury asked, "Like the dance when you were 14?" and Udall responded, "yea but way better."

Westbury asked how Udall was going to get away the next day. Udall wrote, "I will have to try to work on that," "I will try I promise I will try," and "I do not want to make a promise and something go wrong and have to break it." He wrote, "it hurts that I just cant run off to see you." Udall said he would work on a way to get away from everyone to meet Julia at the park. He explained that he was a coach and he would know whether he could get away and meet Julia after the second game and he would text her. Udall wrote that he would think about Julia just like last night. He said he dreamed about her—"I remember you and I were together and everyone thought it was a good thing." He said it was a good thing "as long as we do not get caught." The instant chat session ended at 11:02 p.m.

The next day, police set up a surveillance team to observe Udall and the park where he discussed meeting with Julia, but Udall did not go to the park. Westbury testified that Udall drove by the park. That evening, September 19, 2009, Westbury logged into Julia's Facebook account and engaged in another instant chat session with Udall while posing as Julia. Westbury copied the conversation and a transcript was admitted into evidence.

Udall wrote that he had been called in for work that day because a drunk driver hit a power pole. He worked for PG&E. He said he hoped Wife would go to the women's retreat so Julia and he could see each other. He wrote, "this will be my first time cheating." Westbury asked if Udall still wanted to see Julia. Udall responded, yes, but he was scared that he would want more than he could have; he said, "what if I want to be with you more than my family its not like I can leave them and marry you." He asked if he should wear protection. Westbury responded that it was up to him. Udall wrote that he wanted to wrap his arms around Julia and hold her tight and he would take his time and go slow. He said she would learn what she liked, such as "kissing your body in def places," "neck breast back tummy legs and any other spot you maybe curious about." He mentioned "kissing/licking" "breast pussy butt." He suggested that Julia spend a night with Daughter and then she could sneak out of her room and into his bed.

Udall asked whether he needed to buy protection. He said he would only want Julia to get pregnant "if I thought there was a way for us to be married." Later, Westbury wrote that he (as Julia) was scared, and Udall wrote, "ok if you want to back out its ok, we are friends and I will not ever get mad." He wrote, "lets try for womens retreat." Udall said that, the day they went to the lake, he had been scared to look at her because he was scared everyone could see what he was thinking—that she was sexy and he wanted to kiss her. Again, Udall asked whether Julia wanted him to use protection and whether she wanted him to "sho[o]t it in you." This Facebook chat session began at 8:48 p.m. and ended at 11:06 p.m.

On September 23, 2009, Westbury arrested Udall. He examined Udall's cell phone and confirmed that he had been texting Julia. Westbury interviewed Udall in the police department's investigation room. The interview was videotaped, and a DVD of the interview was played for the jury.

In the interview, Westbury explained there had been a report of inappropriate conversations over the Internet. Initially, Udall said that Julia started the inappropriate conversations with him on Facebook and he was only trying to scare her. He said, "I should [have] gone to her grandfather instead of trying to scare the tar out of her." He described Julia as "kind of the, I, you know gets in trouble a lot type kid." Udall said Julia did not live with parents and he had heard her father was in prison. He told Westbury that she asked specific questions about sex and "I said no you don't want to do this it hurts." One day Julia told him she loved him and then she started to talk about meeting him. She wanted to meet Udall at the park but he did not go. He said they had exchanged text messages, "it went back and forth ten times each."

Later in the interview, Udall admitted that he told Julia he wanted to do things sexually with her. Westbury asked why he would do that if his purpose was to scare her, and Udall responded, "Things got twisted around." He said he "blew it" and admitted he had sexual conversations with Julia on Facebook on the nights of September 18 and 19, 2009, but before that, their conversations were not inappropriate. He told Westbury, "I got roped in," "[b]ut I, I quickly got out." Westbury asked whether, during his conversations with Julia, Udall thought this could be a possibility. Udall responded that he "[g]ot into dreamland about it but reality is I knew I could never, would never." "I mean in my own mind but not communicated it you know but then you stop and say [wait] a minute here we're talking a thirteen year old girl no."

Udall said he and Julia talked about going to Magic Mountain or Disneyland, and he mentioned that Wife goes to a women's retreat and leaves him with the kids, but he made no set dates. He reiterated that he did not meet Julia at the park, stating, "I was at my office and there was no way I [was] going to the park." He explained that he planned to work that day and "that was kind of a reinforcement to make sure ...." Westbury asked, "Were, were you tempted to meet her?" Udall responded, "To be honest with you yeah ... [¶] ... [¶] I was but ... [¶] ... [¶] I would not that's over an internet not seeing the person .... [¶] ... [¶] I know I would not cross that line." He continued, "Sitting on the internet on the couch middle of dark you know middle of the night not looking at a picture of the person not seeing the person is like a dreamland type thing[,] but to do it[,] no

7

way."

Westbury asked if Udall had had a similar "situation" on the Internet with anyone else. Udall responded he had some cybersex-type conversations on Yahoo Messenger and "that's been my vice I've been trying to break." He said he had "done this stuff before" but he "never ever met anybody never will meet anybody." Among other Internet contacts, Udall said he had sexually related chats with a 14-year-old girl during the summer. He said he had stopped, but "then [Julia] popped up and I made a mistake." Westbury eventually told Udall that he had been chatting with him, not Julia, the previous Friday and Saturday nights. Later in the interview, Udall said, "I admit I was very dumb you know I let this get out of control and I should have not done it .... I'm guilty of letting it get out of control .... I'm glad nothing physically happened.... And nothing would have and I won't."

At the end of the interview, Westbury gave Udall an opportunity to write an apology letter. Udall wrote an apology letter to Julia's grandfather, which was admitted into evidence. Udall wrote, in part: "Your granddaughter and I started off chatting. It was just normal stuff, and then went out of control. I made a mistake, and did not stop it. I allowed it, and then encouraged it. I am so ashamed right now. At that point in my mind I was talking to a fantasy computer, not a person." He wrote that he would pray to God that this will never happen again.

Dustin Dodd, a police officer and computer forensic analyst, testified that he executed a search warrant of Udall's home and seized two computers and an external hard drive. On Udall's laptop computer, Dodd found a Yahoo Messenger profile and "images depicting sexual exploitation of children" in a folder associated with that profile. There was data showing that the Yahoo Messenger profile visited various chat groups and engaged in chats with other users whose profiles "were all names of people who purported to be younger minors." Dodd explained that profile names may include a year of birth. For example, a user profile name of "BRIW1996" would imply the user was around 13 years old in 2009.

Dodd recovered "hundreds and hundreds" of chat logs from before June 2009 to August 11, 2009. In the chat sessions, the Yahoo Messenger profile associated with Udall's computers would tell others his age, sex, location, and sometimes would say he worked for PG&E. Typically, within four or five messages, the conversations would become sexually explicit. Dodd testified that Udall "would talk about things that he would want them to do if they had met up or things he would want to do to them; how experienced they were sexually, and things like that." For example, Udall engaged in a chat with "Simba," who said he was 13 years old and from Georgia. Udall asked Simba, "What do you like to do with a guy?" and Simba responded "Be the girl ...." Udall wrote to Simba, "Would I get to lick you?" and "I want to suck you and FUCK you." Dodd testified there were several hundred chat logs "that were just like this." In one chat log, Udall chatted with a person who identified herself as a 14-year-old girl. Udall wrote, "I really get turned on by girls your age."

There were also logs showing Udall requesting, offering, distributing, and looking at sexual images of minors. Dodd found many pornographic images involving children on Udall's computers. These

included "a black-and-white photo of roughly an eight-to ten-year-old female completely nude with an adult male inserting his penis into her vagina," a "color image of a young female, approximately eight to ten years old, wearing panties, lifting up her top and pinching her nipples for the camera," and an image of a girl approximately 10 to 12 years old with semen on her face. On cross-examination, Dodd testified that he found more pornographic images of adults than of children on Udall's computers.

Udall's former supervisor, Daughter, and Udall himself testified for the defense. James Redman, Udall's former supervisor at PG&E, testified that Udall worked four hours of scheduled overtime on Saturday, September 19, 2009, from 4:00 p.m. to 8:00 p.m. The work did not involve an emergency such as a drunk driver running into a power pole. Redman described Udall as "[a] very honorable employee, very conscientious" and "truthful and honest."

Daughter testified that she met Julia at church; Julia's grandfather was a pastor at the church. She never saw her father look at Julia or any of her friends in a weird or inappropriate way. She thinks her father is very truthful and "teaches [her] right from wrong ...." Daughter spent about 60 days or more in the hospital in 2007, and her father would spend the night at the hospital with her. She said he was like her best friend.

Udall testified that he began visiting chat rooms in September 2007 when Daughter, who had first been diagnosed with leukemia in 2005, relapsed. At that time, he "really got mad at God." He was told that the treatment for Daughter was not working and they had the choice of making her comfortable and letting her die or trying radical treatments. A nurse at the hospital suggested online chat rooms as a way of dealing with Daughter's illness. He explained: "I went to the chat rooms, because I wanted [to] escape my reality. When I was in them, I wasn't Todd Udall, married, two kids. I was Todd Udall single, no children. I lived in Santa Cruz, California.... I was in my 30s; looking for a different life and—escaping my reality."

Udall admitted that he chatted online with people who purported to be 14 years old and as young as 11 and 12 years old. People would sometimes send him pornographic pictures of children, but he would delete them. He was not looking for photos; he "was seeking chat." He admitted that he wrote, "I really get turned on by girls your age" to a person who said she was 14 years old. He joined chat groups that had names such as "youngnudegirlsonly," "1800gotlolitas," and "schoolgirlcuties." Udall admitted that his chats were about having sex with children, but he denied that it was his fantasy to have sex with children.

Udall's church suggested all the members become Facebook friends, and that was how Julia became his friend on Facebook. Julia's grandfather also approached Wife and asked the family to befriend Julia because she had a rough childhood and she needed good friends.

Udall testified that his first Internet conversation with Julia of a sexual nature occurred on Thursday, September 17, 2009. That night, Udall and Wife had a "pretty big argument over finances ...." They had one particular medical bill that was $124,000 and their insurance companies did not want to pay it. Other bills were also stacking up. Udall began

9

chatting with Julia on Facebook and told her about the fight. Julia said if she were his wife, they would not have fights like that. Udall wrote that he was old, and Julia told him he looked young. He testified, "She started saying things just kind of making me feel good." He admitted that he talked about going to the movies, asked Julia if she were a virgin, and started talking about having sex. He viewed his conversations with Julia like his Yahoo Messenger chats, as an escape from reality. Udall said it was Julia who asked him to text her, but he admitted that he sent her texts about sex on Friday, September 18, 2009, and specifically texted about finding a time and place to meet. Asked why he would text a 13-year-old girl about sex, Udall responded, "Wish I wasn't. I just got caught up in the moment."

Udall discussed meeting Julia at a park, but he had no intention of meeting her. He only wrote that he would try to meet her, and he never planned to meet her. Udall testified that, during all the Facebook conversations and text messages of September 17, 18 and 19, 2009, he never intended to meet Julia for the purpose of having a sexual relationship. On cross-examination, Udall said he knew the women's church retreat was sometime in October 2009 at Hume Lake.

The jury found Udall guilty of counts 1, 2, 4, 5, and 6. The jury found Udall not guilty of count 3, arranging a meeting with a minor for the purpose of engaging in lewd or lascivious behavior.

The trial court sentenced Udall to state prison for a total term of three years eight months, consisting of the middle term of three years for count 1, plus a concurrent middle term of three years for count 2, plus a consecutive term of eight months (one-third the middle term of two years) for count 4. The court stayed the sentence for counts 5 and 6 pursuant to section 654.

People v. Udall, 2013 Cal. App. Unpub. LEXIS 7325, 2-23 (Cal. App. 2013).

## III.   Discussion

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  (Pet.)  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).  Accordingly, this Court has jurisdiction over the instant action.

///

1

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by AEDPA provisions.

Under AEDPA, a person in custody under a judgment of a state court may only be granted a writ of habeas corpus for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.    Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that [are] materially indistinguishable from [a Supreme Court case] but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner."  Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'"  Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under §

1  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

2  (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

3  71 (2003).  A state court decision will involve an "unreasonable application of" federal

4  law only if it is "objectively unreasonable."  Id. at 75-76 (quoting Williams, 529 U.S. at

5  409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).  In Harrington v. Richter, the

6  Court further stresses that "an *unreasonable* application of federal law is different from

7  an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011) (citing Williams, 529

8  U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

9  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

10 correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

11 U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts

12 have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

13 Ct. 1855, 1864 (2010).  "It is not an unreasonable application of clearly established

14 Federal law for a state court to decline to apply a specific legal rule that has not been

15 squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

16 (2009) (quoted by Richter, 131 S. Ct. at 786).

17            **2.     Review of State Decisions**

18         "Where there has been one reasoned state judgment rejecting a federal claim,

19 later unexplained orders upholding that judgment or rejecting the claim rest on the same

20 grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

21 "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

22 (9th Cir. 2006).   Determining whether a state court's decision resulted from an

23 unreasonable legal or factual conclusion, "does not require that there be an opinion from

24 the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.

25 "Where a state court's decision is unaccompanied by an explanation, the habeas

26 petitioner's burden still must be met by showing there was no reasonable basis for the

27 state court to deny relief."  Id. "This Court now holds and reconfirms that § 2254(d) does

28 not require a state court to give reasons before its decision can be deemed to have been

1  'adjudicated on the merits.'" Id.

2      Richter instructs that whether the state court decision is reasoned and explained,

3  or merely a summary denial, the approach to evaluating unreasonableness under §

4  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

5  or theories supported or, as here, could have supported, the state court's decision; then

6  it must ask whether it is possible fairminded jurists could disagree that those arguments

7  or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

8  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

9  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

10  authority to issue the writ in cases where there is *no possibility* fairminded jurists could

11  disagree that the state court's decision conflicts with this Court's precedents."  Id.

12  (emphasis added).  To put it yet another way:

13          As a condition for obtaining habeas corpus relief from a federal
            court, a state prisoner must show that the state court's ruling on the claim
14          being presented in federal court was so lacking in justification that there
            was an error well understood and comprehended in existing law beyond
15          any possibility for fairminded disagreement.

16  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

17  are the principal forum for asserting constitutional challenges to state convictions." Id. at

18  787.  It follows from this consideration that § 2254(d) "complements the exhaustion

19  requirement and the doctrine of procedural bar to ensure that state proceedings are the

20  central process, not just a preliminary step for later federal habeas proceedings."  Id.

21  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

22      **3.      Prejudicial Impact of Constitutional Error**

23      The prejudicial impact of any constitutional error is assessed by asking whether

24  the error had "a substantial and injurious effect or influence in determining the jury's

25  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

26  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

27  state court recognized the error and reviewed it for harmlessness).  Some constitutional

28  errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

1    Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

2    (1984).

3    **IV.    Review of Petition**

4         **A.    Claim One – Instruction on Lesser Included Offenses**

5         Petitioner contends the trial court violated his constitutional rights by failing to

6    instruct the jury regarding lesser included offenses of sending harmful material to a

7    minor that did not require a showing of intent to seduce.

8         **1.    State Court Decision**

9         Petitioner presented this claim by way of direct appeal to the California Court of

10   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

11   appellate court and summarily denied in subsequent petition for review by the California

12   Supreme Court. (See Lodged Docs. 1-6.) Because the California Supreme Court's

13   opinion is summary in nature, this Court "looks through" that decision and presumes it

14   adopted the reasoning of the California Court of Appeal, the last state court to have

15   issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05, 111 S. Ct.

16   2590, 115 L. Ed. 2d 706 & n.3 (1991) (establishing, on habeas review, "look through"

17   presumption that higher court agrees with lower court's reasoning where former affirms

18   latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir.

19   2000) (holding federal courts look to last reasoned state court opinion in determining

20   whether state court's rejection of petitioner's claims was contrary to or an unreasonable

21   application of federal law under 28 U.S.C. § 2254(d)(1)).

22        In denying Petitioner's claim, the Fifth District Court of Appeal explained:

23        II. Jury instructions

24             Udall contends the trial court erred by failing to instruct *sua sponte*

25   on section 313.1, subdivision (a), as a lesser-included offense of section
     288.2, subdivision (a), the charged offense of counts 4, 5, and 6.

26             Section 288.2, subdivision (a), makes it a crime for a person to
     knowingly send, distribute, or exhibit any harmful matter[fn4] to a minor
27   "with the intent of arousing, appealing to, or gratifying the lust or passions
     or sexual desires of that person or of a minor, and with the intent or for the
28   purpose of seducing a minor ...."

**FN4**: "Harmful matter" is defined in section 313, subdivision (a), as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

Section 313.1, subdivision (a), makes it a misdemeanor to knowingly sell, rent, send, distribute, or exhibit harmful matter to a minor. We assume section 313.1, subdivision (a), is a necessarily included lesser offense[fn5] of section 288.2, subdivision (a). (See People v. Jensen (2003) 114 Cal.App.4th 224, 244 [§ 313.1, subd. (a), is lesser-included offense of § 288.2, subd. (b), sending harmful matter by electronic mail, Internet, or online service to minor with intent to seduce] (Jensen); People v. Nakai (2010) 183 Cal.App.4th 499, 507 [assuming without deciding that § 313.1, subd. (a), is necessarily included offense of § 288.2, subd. (a)] (Nakai).)

**FN5**: "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (People v. Birks (1998) 19 Cal.4th 108, 117-118.)

A trial court must give an instruction on a lesser-included offense *sua sponte* if the evidence warrants the instruction. (People v. Cook (2006) 39 Cal.4th 566, 596.) The evidence warrants the instruction if there is substantial evidence which, if accepted, would absolve the defendant of the greater offense, but not the lesser. (People v. Waidla (2000) 22 Cal.4th 690, 733.) We review de novo the court's instructions on lesser-included offenses. (People v. Cook, *supra*, at p. 596.)

Two published cases addressing this issue are instructive. In Jensen, *supra*, 114 Cal.App.4th 224, the defendant engaged in many sexually explicit chat sessions with, and sent pornographic pictures to, "Scotty" and "Ryan," the online profiles for two fictitious 13-year-old boys that had been created by two police officers. (Id. at pp. 227-234.) At trial, the defendant's attorney argued that, for the defendant, this was fantasy and entertainment but "there 'was no indication whatsoever that he ever intended to meet these boys.'" (Id. at p. 238.) The defendant was convicted of nine counts of attempted distribution or exhibition of harmful matter to a minor over the Internet with intent to seduce (§§ 664, 288.2, subd. (b)). (Jensen, supra, at p. 226.) On appeal, he argued the trial court should have instructed the jury on the lesser offense of misdemeanor distribution of harmful matter in violation of section 313.1, subdivision (a). (Jensen, supra, at p. 243.) The Court of Appeal agreed, explaining:

"The evidence presented at trial raised a substantial question as to whether defendant actually harbored the specific intent to seduce 'Ryan' or 'Scotty.' Defendant essentially admitted all of the other elements of the offenses. Reasonable jurors could have concluded that defendant distributed harmful matter to 'Ryan' and 'Scotty' believing that they were minors and harbored the intent to arouse himself

15

or them but lacked the intent to have any physical contact with them. Such a conclusion is consistent with guilt of only [section 313.1, subdivision (a)] rather than [section 288.2]." (Jensen, *supra*, 114 Cal.App.4th at pp. 244-245.)

In Nakai, *supra*, 183 Cal.App.4th at pages 501-502, the defendant engaged in sexual online chats with Colleen, a woman posing as a 12-year-old girl living in Riverside, California. He sent her a picture of his erect penis and, among other things, asked her if she would suck his dick and if she would like to "ride on it." (Id. at p. 502.) Colleen told the defendant he could come to her house that Saturday at 6:00 p.m. He asked for her address, and she gave him the address of a house where the Riverside County Sheriff's Department was planning an "'Internet decoy sexual predator sting.'" (Id. at pp. 505-506.) That Saturday, the police found defendant sitting in his car near the sting house at around 3:00 p.m. (Id. at p. 506.) He was charged with two counts of attempting to send or exhibit harmful matter to a minor with the intent of seducing the minor.

At trial, his attorney requested instructions on the lesser offense, section 313.1, subdivision (a). (Nakai, *supra*, 183 Cal.App.4th at p. 506.) The trial court denied the request, reasoning that defendant's chat sessions showed his sole intention was to seduce the purported 12-year-old girl with whom he thought he was communicating. The trial court noted that no evidence was presented that defendant harbored a different intent. (Id. at p. 507.) The Court of Appeal "agree[d] with the trial court's conclusion that there is no evidence that a reasonable jury could find persuasive that, if accepted, would absolve defendant from guilt of the greater offense but not the lesser, because the evidence only demonstrates defendant's combined intents to arouse and seduce." (Id. at p. 508.)

Udall argues that this case is similar to Jensen, as there was evidence from which a reasonable jury could find that he had no intention to seduce Julia. The Attorney General responds that this case is more like Nakai because Udall's messages to Julia "were tailored toward seducing the victim and getting her to meet him." For example, he talked about going on a date with Julia when Wife was away at a women's retreat. He said he wanted her really bad and he was "so crazy for [her]." He told her he would go slow and not hurt her. He sent her text messages saying he wanted to know what would make her happy. He told her he dreamed about her and wrote, "I think I love you."

We agree with the Attorney General that Udall's own words are persuasive evidence of his intent to seduce Julia. We cannot, however, ignore Udall's own testimony that he never intended to meet Julia for the purpose of having a sexual relationship. This was arguably evidence from which a jury could find that Udall committed the lesser offense of sending harmful material, but not the greater offense of doing so with the intent to seduce. For this reason, we hesitate to conclude that no instruction on section 313.1, subdivision (a), should have been given in this case.

Even so, Udall's contention fails because we find no prejudice. In a noncapital case, failure to instruct sua sponte on lesser-included offenses that are supported by the evidence is reviewed for prejudice under Watson.[fn6] (People v. Breverman (1998) 19 Cal.4th 142, 178.) Thus, "[a]

conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (Ibid.) Here, the evidence of Udall's intent to seduce Julia was overwhelming. The only counterevidence was Udall's testimony that, while he enjoyed the fantasy, he never intended to have sex with Julia. Obviously, the jury was not swayed by this testimony.

**FN6**: People v. Watson (1956) 46 Cal.2d 818, 836.

The jury received its final instructions on the afternoon of May 17, 2011, and deliberated for fewer than 30 minutes. The next day, the jury resumed deliberations at 1:25 p.m. and submitted a question to the court at 4:25 p.m. The jury adjourned for the day at 4:35 p.m. The question related to count 3, arranging a meeting with a minor for the purpose of engaging in lewd or lascivious behavior in violation of section 288.4, subdivision (a)(1).

The next day, the court addressed the jury's question first thing in the morning. The jury resumed deliberations at 9:04 a.m. and notified the clerk it had reached a verdict at 9:35 a.m. In addition to finding Udall guilty of three counts involving section 288.2, subdivision (a), the jury found him guilty of two counts of violation of section 288.3, subdivision (a), contacting or attempting to contact a minor with intent to commit certain felonies (in this case, lewd and lascivious conduct with a minor). This means the jury determined that Udall intended to commit acts with Julia, rejecting Udall's testimony that he had no intention of ever meeting Julia. In light of these proceedings, it is not reasonably probable that Udall would have obtained a more favorable outcome had the trial court given instructions on section 313, subdivision (a).

People v. Udall, 2013 Cal. App. Unpub. LEXIS 7325 at 23-30.

## 2.    Analysis

To the extent Petitioner alleges the instructional claim violated state law, Petitioner's claim is not cognizable in this proceeding. The Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. at 71-72. A claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3). Accordingly, to the extent that Petitioner raises state law claims, his claims should be dismissed.

1      Although the Supreme Court has held that the failure to instruct on lesser included

2   offenses can constitute constitutional error in capital cases, <u>Beck v. Alabama</u>, 447 U.S.

3   625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), it has reserved decision on whether such

4   an omission in non-capital cases constitutes constitutional error, <u>id.</u> at 638 n.7. When the

5   Supreme Court has expressly reserved consideration of an issue, there is no Supreme

6   Court precedent creating clearly established federal law relating to a petitioner's habeas

7   claim. <u>Alberni v. McDaniel</u>, 458 F.3d 860, 864 (9th Cir. 2006). Therefore, a petitioner

8   cannot rely on circuit authority, and there is no basis for relief pursuant to § 2254(d)(1)

9   for an unreasonable application of clearly established federal law. <u>Alberni v. McDaniel</u>,

10  458 F.3d at 864; <u>Brewer v. Hall</u>, 378 F.3d 952, 955-57 (9th Cir. 2004).

11      Accordingly, there is no clearly established federal law within the meaning of §

12  2254(d) concerning a state court's rejection of a claim that Sixth and Fourteenth

13  Amendment rights in a non-capital case were violated by a failure to instruct on a lesser

14  included offense. Thus, such a claim is not cognizable in a proceeding pursuant to 28

15  U.S.C. § 2254 and is subject to dismissal. <u>Windham v. Merkle</u>, 163 F.3d 1092, 1105-06

16  (9th Cir. 1998).

17      Further, the absence of the instruction did not result in any fundamental

18  unfairness. The only basis for federal collateral relief for instructional error is that an

19  infirm instruction or the lack of instruction by itself so infected the entire trial that the

20  resulting conviction violates due process. <u>Estelle v. McGuire</u>, 502 U.S. at 71-72; <u>Cupp v.</u>

21  <u>Naughten</u>, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); <u>see</u> <u>Donnelly v.</u>

22  <u>DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) (it must be

23  established not merely that the instruction is undesirable, erroneous or even "universally

24  condemned," but that it violated some right guaranteed to the defendant by the

25  Fourteenth Amendment). The Court in <u>Estelle</u> emphasized that the Court had very

26  narrowly defined the category of infractions that violate fundamental fairness, and that

27  beyond the specific guarantees enumerated in the Bill of Rights, the Due Process

28  Clause has limited operation. 502 U.S. at 72-73.

1    However, when habeas is sought under 28 U.S.C. § 2254, a failure to instruct on

2    the defense theory of the case constitutes error if the theory is legally sound and

3    evidence in the case makes it applicable. Clark v. Brown, 450 F.3d 898, 904 (9th Cir.

4    2006); see Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54

5    (1988) (reversing a conviction and holding that even if a defendant denies one or more

6    elements of the crime, he is entitled to an entrapment instruction whenever there is

7    sufficient evidence from which a reasonable jury could find entrapment, and the

8    defendant requests such an instruction).

9    Petitioner contends that he had no intention in meeting with the victim, and

10   therefore the lesser included offense of sending harmful matter to a minor under Cal.

11   Penal Code. 313.1(a) which did not require a showing of intent to seduce or arouse was

12   applicable.

13   The state court noted that it took into consideration Petitioner's testimony that he

14   never intended to act on the conversations and attempt to meet with the victim.

15   However, the Court of Appeal concluded that even assuming that the state court erred in

16   failing to give the instruction, there was no prejudice. The Court noted that the jury

17   deliberated and convicted Petitioner of sending harmful materials with the intent to

18   seduce, along with other charges including two counts of contacting or attempting to

19   contact a minor with intent to commit a lewd act. Based on all the convictions, the state

20   court held that the jury necessarily discredited his comments that he did not intend to

21   act, but instead found that he did have the requisite intent to meet with the victim and

22   commit lewd and lascivious conduct.

23   In his traverse, Petitioner's main contention is that he did not actually attempt to

24   meet with the victim at the arraigned time, and therefore there was no evidence of intent.

25   Under California law intent is viewed at the time the harmful material was sent, not

26   whether there was intent to seduce at the time of the arraigned meeting. See People v.

27   Nakai, 183 Cal. App. 4th 499, 508 (2010). The fact that Petitioner did not attempt to

28   meet the victim does not negate the jury's finding of intent that occurred at the time

1    Petitioner was engaged in his internet communication with the victim.  Based on the

2    frequency, duration, and detail of Petitioner's conversations, it was reasonable for the

3    state court to find that Petitioner did not suffer any fundamental unfairness or that the

4    omission of the instruction had any substantial or injurious effect or influence in

5    determining the jury's verdict. Accordingly, the Court denies Petitioner's claim concerning

6    the failure to instruct on the lesser included offense of Cal. Penal Code 313.1(a).

7        **B.    Claim Two – Equal Protection and Custody Credit Calculation**

8        Petitioner, in his second claim, contends that his equal protection rights were

9    violated when he was denied a more generous rate of custody credit calculation.

10                **1.    State Court Decision**

11        Petitioner presented this claim by way of direct appeal to the California Court of

12    Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

13    appellate court and summarily denied in subsequent petition for review by the California

14    Supreme Court. (See Lodged Docs. 1-6.) Because the California Supreme Court's

15    opinion is summary in nature, this Court "looks through" that decision and presumes it

16    adopted the reasoning of the California Court of Appeal, the last state court to have

17    issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

18        In denying Petitioner's claim, the Fifth District Court of Appeal explained:

19        IV. Presentence conduct credit

20            The trial court sentenced Udall on July 26, 2011. He received
21    conduct credit calculated at the rate of two days for every four days
     served, the accrual rate provided under former section 4019. (Stats. 2010,
22    ch. 426, § 2; see People v. Ellis (2012) 207 Cal.App.4th 1546, 1549.)
     Section 4019 was amended effective October 1, 2011, to provide for
23    accrual of conduct credit at a day-for-day rate. (Stats. 2011, ch. 39, § 53.)
     Although Udall was sentenced before the current section 4019 came into
24    effect, he claims he is entitled to its more generous rate of conduct credit
     accrual based on equal-protection principles. After Udall filed his opening
25    brief, our court rejected this argument in People v. Ellis, supra, at page
     1552. We decline to revisit Ellis and, as a consequence, Udall's equal-
26    protection claim fails.

27    People v. Udall, 2013 Cal. App. Unpub. LEXIS 7325 at 45-46.

28    ///

20

1

## 2.  Analysis

The Equal Protection Clause essentially requires that all persons similarly situated be treated alike. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). "States must treat like cases alike but may treat unlike cases accordingly." Vacco v. Quill, 521 U.S. 793, 799, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997) (citing Plyler v. Doe, 457 U.S. 202, 216, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) and Tigner v. Texas, 310 U.S. 141, 147, 60 S. Ct. 879, 84 L. Ed. 1124 (1940)). The Fourteenth Amendment "guarantees equal laws, not equal results." McQueary v. Blodgett, 924 F.2d 829, 835 (9th Cir. 1991) (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 273, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)). Moreover, "a mere demonstration of inequality is not enough… There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises." McQueary, 924 F.2d at 835. A habeas petitioner has the burden of alleging facts sufficient to establish "a prima facie case of uneven application." Id.

In People v. Lara, the California Supreme Court explained:

> Today local prisoners may earn day-for-day credit without regard to their prior convictions. (See § 4019, subds. (b), (c) & (f), as amended by Stats.2011, ch. 15, § 482.) This favorable change in the law does not benefit defendant because it expressly applies only to prisoners who are confined to a local custodial facility "*for a crime committed on or after October 1, 2011.*" ( § 4019, subd. (h), italics added.)

> Defendant argues the Legislature denied equal protection (see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) by making this change in the law expressly prospective. We recently rejected a similar argument in People v. Brown (2012) 54 Cal.4th 314, 328-330, 142 Cal.Rptr.3d 824, 278 P.3d 1182 (Brown). As we there explained, "'[t]he obvious purpose'" of a law increasing conduct credits "'is to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in prison.' [Citation.] '[T]his incentive purpose has no meaning if an inmate is unaware of it. The very concept demands prospective application.'" (Brown, at p. 329, 142 Cal.Rptr.3d 824, 278 P.3d 1182, quoting In re Strick (1983) 148 Cal.App.3d 906, 913, 196 Cal.Rptr. 293.) Accordingly, prisoners who serve their pretrial detention before such a law's effective date, and those who serve their detention thereafter, are not similarly situated with respect to the law's purpose. (Brown, at pp. 328-329, 142 Cal.Rptr.3d 824, 278 P.3d 1182.)

54 Cal.4th at 906, n.9. Petitioner has failed to demonstrate that he was treated

1    differently from other similarly situated prisoners without a rational basis. This is

2    because, as explained in Lara, Petitioner is not similarly situated with prisoners who

3    committed their crimes after the revision of the conduct credit provisions of the

4    Realignment Act. Petitioner has also failed to demonstrate "invidiousness or illegitimacy

5    in the statutory scheme." McQueary, 924 F.2d at 835.

6        The decision of the California Court of Appeal denying petitioner's Equal

7    Protection claim is not contrary to or an unreasonable application of federal law.

8    Accordingly, Petitioner is not entitled to federal habeas relief.

9        **C.    Claim Three – Violation of First Amendment Rights**

10       In claim three of the petition, Petitioner asserts that the various sections of Cal.

11   Penal Code § 288 for which he was convicted violate the First Amendment. (See Pet. at

12   9-12.) Petitioner did not present this claim on review to state court, and it is therefore

13   unexhausted. However, "[a]n application for a writ of habeas corpus may be denied on

14   the merits, notwithstanding the failure of the applicant to exhaust the remedies available

15   in the courts of the State." 28 U.S.C. 2254(b)(2).

16       The Ninth Circuit recently stated, "In the case of a habeas petition implicating the

17   First Amendment, we first 'must, as a reviewing court, conduct our own independent

18   review of the record. In so doing, we must exercise independent judgment as to the legal

19   issue of whether [the habeas petitioner]'s speech and association were protected." See

20   Shoemaker v. Taylor, 730 F.3d 778, 784 (9th Cir. 2013) (quoting McCoy v. Stewart, 282

21   F.3d 626, 629 (9th Cir.2002) (conducting an independent review prior to analyzing a

22   habeas claim implicating the First Amendment)). However, Petitioner's speech is not

23   protected by the First Amendment. Petitioner's First Amendment challenge lacks merit

24   because Cal. Penal Code § 288, which proscribes lewd or lascivious acts against

25   minors, criminalizes conduct rather than speech. See United States v. Williams, 553 U.S.

26   285, 297, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ("Offers to engage in illegal

27   transactions are categorically excluded from First Amendment protection.").

28       In a similar case, the Ninth Circuit rejected a facial overbreadth challenge to a

1    federal criminal statute, 18 U.S.C. § 2422(b), which had been used to prosecute a

2    defendant for knowingly inducing a minor over the internet to engage in illegal sexual

3    acts. See United States v. Dhingra, 371 F.3d 557, 561-62 (9th Cir. 2004). The Ninth

4    Circuit reasoned that the statute limited only conduct outside the First Amendment's

5    protection (i.e., the targeted inducement of minors for illegal sexual activity). See id.

6    Based on the same reasoning, § 288 is not facially overbroad because it criminalizes

7    conduct, such as the touching or attempted touching of a minor's body with sexual intent,

8    rather than speech. See United States v. Meek, 366 F.3d 705, 721 (9th Cir. 2004)

9    (finding no First Amendment protection where "speech is merely the vehicle through

10   which a pedophile ensnares the victim."); see also United States v. Hornaday, 392 F.3d

11   1306, 1311 (11th Cir. 2004) ("Speech attempting to arrange the sexual abuse of children

12   is no more constitutionally protected than speech attempting to arrange any other type of

13   crime."); United States v. Bailey, 228 F.3d 637, 639 (6th Cir. 2000) ("[T]he Defendant

14   simply does not have a First Amendment right to attempt to persuade minors to engage

15   in illegal sexual acts.").

16         To the extent Penal Code § 288 might otherwise chill a substantial amount of

17   protected speech, its intent requirement eliminates that possibility. Section 288 requires

18   intent to arouse or gratify the sexual desires of either the perpetrator or victim; in other

19   words, there must be an intent to sexually exploit a minor. See People v. Martinez, 11

20   Cal. 4th 434, 444 (1995) ("[C]ourts have long indicated that section 288 prohibits all

21   forms of sexually motivated contact with an underage child. Indeed the 'gist' of the

22   offense has always been the defendant's intent to sexually exploit a child, not the nature

23   of the offending act.") (citation omitted); see also Bailey, 228 F.3d at 639 (finding no

24   overbreadth problem where "[t]he statute only applies to those who 'knowingly' persuade

25   or entice, or attempt to persuade or entice, minors. Thus, it only affects those who intend

26   to target minors.").

27         Accordingly, the Court finds that Petitioner's claim is without merit, and it would

28   not have been an objectively unreasonable determination of the state court to conclude

1  that § 288 does not violate the First Amendment. Petitioner is not entitled to relief with

2  regard to his third claim.

## V.   Conclusion

Petitioner is not entitled to relief with regard to the claims presented in the instant

petition. The Court therefore orders that the petition be DENIED.

## VI.   Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

appeal a district court's denial of his petition, and an appeal is only allowed in certain

circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of

appealability "if jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327; <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further.   Petitioner has not made the required substantial showing of the denial of a constitutional right.   Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**VII.   Order**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   December 20, 2016        /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE